UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BU8 SDN. BHD.,<br><br>        Petitioner,<br><br>    v.<br><br>CREAGRI, INC.,<br><br>        Respondent.<br>_____/ | No. C-14-4503-EMC<br><br>**ORDER (1) GRANTING BU8'S MOTION TO CONFIRM ARBITRATION AWARD; (2) GRANTING BU8'S MOTION TO DISMISS CREAGRI'S COUNTERCLAIMS; AND (3) DENYING BU8'S MOTION FOR AN AWARD OF FEES AND COSTS**<br><br>**(Docket No. 15)** |

## I. INTRODUCTION

On October 8, 2014, BU8 Sdn. Bhd. filed a petition to confirm an arbitration award (the "Award") entered against Respondent CreAgri Inc. The Award was issued in Singapore by an arbitrator applying Singapore law, pursuant to an arbitration clause contained in the relevant contract between BU8 and CreAgri.

Courts asked to confirm foreign arbitration awards "shall confirm the award" unless the party opposing confirmation can establish one of seven specific defenses. 9 U.S.C. § 207. As explained below, CreAgri cannot show that any of these limited defenses are applicable here, and thus the Court will confirm the Award.

Additionally, CreAgri cannot maintain any of its counterclaims in this action. According to the relevant contract, CreAgri agreed to arbitrate "any dispute or claim related to or arising out of" the contract. Because CreAgri's counterclaims are all "related to or arising out of" the relevant

1 contract, CreAgri was obligated to arbitrate these counterclaims, and may not maintain them in this forum.

Finally, BU8's request for attorneys' fees and costs associated with prosecuting this confirmation action is denied. Courts should only award attorneys' fees and costs when a party acts in bad faith in defending an action to confirm a foreign arbitral award. While CreAgri's arguments in opposition to confirmation of the award are without merit, the Court concludes it has not acted in bad faith sufficient to merit an award of attorneys' fees.

## II.   BACKGROUND

A.   Factual Background

Petitioner BU8 is a Malaysian corporation whose business focuses on marketing and distributing health and wellness products. Docket No. 27 (CreAgri's Opposition to Motion to Confirm Arbitration Award) at 2. Respondent CreAgri is a California corporation that owns eight U.S. patents and eighteen international patents relating to HIDROX®, a health supplement derived from the pulp of olives that's typically used in food, dietary supplements, and skincare products. *Id.* at 3.

On October 6, 2010, CreAgri and BU8 entered into a joint venture agreement (the "JVA" or "Agreement") for the purpose of developing "a coordinated brand and marketing platform to commercialize human dietary supplements containing HIDROX to be sold specifically under the Olivenol Trademarks." Docket No. 1, Exhibit B (JVA) at Recitals.

As part of the JVA, the Parties established a new entity (the "JV Company"). CreAgri was assigned a 40% equity interest in the JV Company, and BU8 was assigned a 60% equity interest. *Id.* at ¶ 1.2. The Agreement included an exclusive license agreement:

> CreAgri will grant an exclusive license to the JV Company of CreAgri IP for the JV Application, under commercially reasonable terms, including the right to sublicense, for (a) use [of] Hidrox for incorporation into the Olivenol Products, [and] (b) use of the Olivenol Trademarks, to promote, market, sell and/or distribute the Olivenol Products.

*Id.* at ¶ 2.3(ii). The JVA defines "CreAgri IP" as CreAgri's "proprietary rights in hydroxytyrosol-rich formulations derived from the pulp of olives (HIDROX), as well as proprietary technology and

United States District Court
For the Northern District of California

know-how to produce HIDROX (such intellectual property in existence as of the effective date of this Agreement)." *Id.* at Recitals.

The JVA contains an arbitration clause that provides that "any dispute or claim related to or arising out of this Agreement, or the interpretation, making, performance, breach or termination thereof" shall be resolved in Singapore according to Singapore law "by arbitration in accordance with the then Arbitration Rules of the Singapore International Arbitration Centre ('SIAC Rules')." *Id.* at ¶ 9.3. It further states that "any final decision issued in arbitration shall be binding and conclusive upon the parties to this Agreement and may be entered as a final judgment by any court of competent jurisdiction." *Id.*

On October 12, 2012, the parties jointly nominated an arbitrator to address their disputes regarding the interpretation of the JVA and any alleged breaches of the Agreement. Docket No. 1, Exhibit A (Arbitration Award) ("Award") at 4, 46-49. Pursuant to the JVA, the arbitration was held in Singapore, administered by SIAC under its Arbitration rules, and was conducted according to Singapore law. *Id.* at 4. The arbitrator issued the Award on August 12, 2014. *Id.* at 103.

In general, the Award purports to enforce the exclusive license agreement of the JVA by prohibiting CreAgri from licensing or otherwise distributing human dietary supplements containing HIDROX with third parties. *Id.* at 101-102. Moreover, the Award provides that CreAgri shall remit an appropriate share of any proceeds it obtains from such third-party agreements, such as one between CreAgri and Cosway.[1] *Id.* at 101-102. Specifically, the Award requires CreAgri to notify BU8 of all profits it has received from the Cosway supply agreement and pay BU8 60% of those net profits. *Id.* at 102.

///
///
///
///

---

[1] Cosway is a third-party marketing company that CreAgri contracted with to sell HIDROX products. Award at 72. The arbitrator found that CreAgri's supply agreement with Cosway breached the JVA between CreAgri and BU8. *Id.*

3

The Award also provided CreAgri additional time to exercise its right to subscribe to further shares in the JV Company.[2] *Id.* at 103. Lastly, the Award requires CreAgri to pay for legal costs incurred by BU8 in connection with the arbitration. *Id.*

B.  Procedural Background

BU8 filed this action to confirm the Award on October 8, 2014. Docket No. 1. On December 9, 2014, CreAgri filed an amended answer opposing BU8's petition to confirm the Award. Docket No. 14. CreAgri's answer contains several putative defenses as well as counterclaims. *Id.* On January 15, 2014, BU8 filed an omnibus motion to confirm the arbitration award, to strike all of CreAgri's pleadings,[3] to dismiss its counterclaims, and for an of award attorneys' fees and costs. Docket No. 15 (BU8's Omnibus Motion) ("Mot."). This Court heard oral argument on BU8's motion on February 12, 2015. Docket No. 37.

## III.   DISCUSSION

A.  Legal Standard

The United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("Convention") governs the "recognition and enforcement" of all foreign arbitral awards in United States courts. 9 U.S.C. § 201 (stating that the Convention "shall be enforced in United States courts").

Under the Convention, a district court "shall" confirm a foreign arbitration award unless the party opposing confirmation can establish one of the defenses enumerated in Article V of the Convention. 9 U.S.C. § 207 ("The court shall confirm the award unless it finds one of the grounds for refusal of recognition or enforcement of the award specified in the said Convention"); *see also Admart AG v. Stephen & Mary Birch Found., Inc.*, 457 F.3d 302, 307 (3d Cir. 2006) (stating that

---

[2] As noted above, CreAgri originally had a 40% ownership stake in the JV Company. Award at 87. An extraordinary general meeting of shareholders was called in order to vote on a rights issue. *Id*. CreAgri did not attend the meeting because of the pending dispute before the arbitrator, and thus did not exercise its right to purchase any of the shares offered. *Id*. at 90. As a result, CreAgri's 40% percent interest in the JV Company was diluted to a .6% equity interest. *Id*. at 87. Apparently, BU8 now controls 99.4% of the JV Company.

[3] Because the Court will confirm the arbitration award and dismiss all of CreAgri's counterclaims, the Court sees no need to further strike all of CreAgri's pleadings. Hence, this specific request for relief is denied.

"[u]nder the Convention, a district court's role is limited – it must confirm the award unless one of the grounds for refusal specified in the Convention applies to the underlying award"). Specifically, the Court may only refuse to confirm an arbitration if the party resisting confirmation can prove:

> (a) The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or
>
> (b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or
>
> (c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or
>
> (d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or
>
> (e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made [or]
>
> . . .
>
> [(f)] The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or
>
> [(g)] The recognition or enforcement of the award would be contrary to the public policy of that country.

*Id.* at 307-308 (quoting Convention art. V).

Public policy strongly favors confirmation of international arbitration awards. *Polimaster Ltd. v. RAE Sys., Inc.*, 623 F.3d 832, 836 (9th Cir. 2010). As the Second Circuit once observed, "[e]xtensive judicial review frustrates the basic purpose of arbitration, which is to dispose of disputes quickly and avoid the expense and delay of extended court proceedings." *Parsons & Whittemore Overseas Co. v. Societe Generale De L'Industrie Du Papier (RAKTA)*, 508 F.2d 969, 977 (2d Cir. 1974) (internal citations omitted). Thus, confirmation proceedings are necessarily

5

"summary" in nature and are "not intended to involve complex factual determinations, other than a determination of the limited statutory conditions for confirmation or grounds for refusal to confirm." *Marker Volkl (Int'l) GmbH v. Epic Sports Int'l, Inc.*, 965 F. Supp. 2d 308, 311 (S.D.N.Y. 2013).

The party defending against enforcement of the award has the burden to prove one of the Convention's enumerated defenses. *Empresa Constructora Contex Limitada v. Iseki, Inc.*, 106 F. Supp. 2d 1020, 1024 (S.D. Cal. 2000); *see also Injazat Tech. Fund, B.S.C. v. Najafi*, No. C 11-4133 PJH, 2012 WL 1535125, at *2 (N.D. Cal. May 1, 2012). The "burden is substantial because the public policy in favor of international arbitration is strong, and the New York Convention defenses are interpreted narrowly." *Polimaster*, 623 F.3d at 836 (internal citation omitted).

B.   BU8's Motion to Confirm Arbitration Award

CreAgri argues that this Court cannot confirm the Award because it has sufficiently established a number of the Convention defenses. As explained in greater detail below, CreAgri is mistaken.

1.   The Award Does Not Exceed the Scope of the Arbitration

CreAgri's principal argument is that the Court should not confirm the Award because the relief awarded by the arbitrator exceeded the scope of the arbitral submission. However, CreAgri has failed to prove this defense. The Award simply enforces many of the terms of the JVA and fashions remedies for breaches of that Agreement.

The arbitration clause in the JVA gives the arbitrator the right to resolve "any issues" relating to the interpretation of the JVA. JVA at ¶ 9.3. Many of CreAgri's arguments regarding scope fail because they wrongly criticize the arbitrator for simply interpreting and enforcing the terms of the JVA. For example, CreAgri argues that the arbitrator exceeded the scope of his authority by awarding the JV Company a license to all CreAgri IP without an "appropriate" limitation. *See* Award at 40. In so arguing, CreAgri alleges that a separate (and unexecuted) contract, the draft Supply and License Agreement ("SLA"), provides the appropriate limitation: CreAgri "could sell HIDROX to third parties for human dietary supplements so long as they did not use the Olivenol trademarks." *Id.* In other words, CreAgri argues that the arbitrator improperly

restricted it from selling human dietary supplements containing HIDROX that are not sold under the "Olivenol" brand name.

As an initial matter, it is neither this Court's role to carefully scrutinize the Award and the parties' agreements, nor to make factual and legal determinations about the actual scope of the JVA's license provisions. *See Parsons & Whittemore Overseas Co.*, 508 F.2d at 977. The Ninth Circuit has made clear that there is a "presumption that an arbitral body has acted within its powers." *Management & Technical Consultants, S.A. v. Parsons-Jurden International Corp.*, 820 F.2d 1531, 1534 (9th Cir. 1987); *see also Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 67 (D.D.C. 2013) (noting "that the 'beyond the scope' defense to confirmation should be construed narrowly and that the party resisting confirmation on such basis must overcome a powerful presumption that the arbitral body acted within its powers"). Additionally, the Ninth Circuit observed that an agreement to arbitrate "any dispute" – like the one contained in the JVA here – should be construed broadly, and that such a provision permits the arbitrator to resolve not just the instant dispute, "but the consequences naturally flowing from it." *Management & Technical Consultants, S.A.*, 820 F.2d at 1535. Thus, the court must "construe arbitral authority broadly to comport with the enforcement-facilitating thrust of the Convention and the policy favoring arbitration." *Id.*

Importantly, the scope of the submission to the arbitrator here was extremely broad. For instance, the "Issues for Determination" included whether CreAgri is "obliged under the JVA to grant or confer on [BU8]" (1) "an exclusive license across all markets world-wide to commercially exploit and utilize the proprietary rights in [HIDROX]," or (2) an "exclusive license to all existing worldwide patents applied for or used by [CreAgri] which relate to Hidrox." Award at 47. The arbitrator was also tasked with deciding "[w]hether the 'Products' referred to in the JVA are limited only to 'Olivenol' Products." *Id.* Each of CreAgri's claimed errors below amount to a disagreement over the arbitrator's findings on the merits in interpreting the JVA. None establish a decision beyond the scope of the submission.

Moreover, the arbitrator's decisions on the merits (even if subject to review) were all colorably correct. For instance, the JVA does not (as CreAgri vigorously contends) patently limit

1  the JV Company's exclusive license solely to "Olivenol Products" or products sold under "Olivenol"
2  trademarks. Rather, it states:

> CreAgri will grant an exclusive license to the JV Company of CreAgri
> IP for the JV Application, under commercially reasonable terms,
> *including* the right to sublicense, for (a) use [of] Hidrox for
> incorporation into Olivenol Products, [and] (b) use of the Olivenol
> Trademarks, to promote, market, sell and/or distribute the Olivenol
> Products.

Agreement at ¶ 2.3(ii) (emphasis added). By its very terms, CreAgri granted the JV Company an exclusive license to all of "CreAgri IP." *Id.* This license does not appear to be limited to just Olivenol products or trademarks. Indeed, the use of the word "including" before subsections (a) and (b) seems to establish that the JV Company's license to CreAgri IP *includes*, *but is not limited to*, the Olivenol products. That would be a reasonable construction of the term "including." Thus, the arbitrator did not exceed the scope of his authority by enforcing the exclusive license agreement without CreAgri's claimed limitations.

The arbitrator also expressly considered CreAgri's arguments about the draft Supply and License Agreement ("SLA"), and rejected them. The JVA does provide that a more detailed SLA should be signed within 30 days of the execution of the Agreement. JVA at ¶ 2.3. The Parties do not dispute that the SLA was not signed in spite of this requirement. Award at 68. It appears that the draft SLA seized upon by CreAgri is the closest the parties ever came to finalizing a SLA.

Despite the fact that no SLA was ever signed, CreAgri argued in the arbitration that the terms of the draft SLA had been incorporated into the JVA. Award at 40. The arbitrator disagreed:

> The parties had in Clause 2.3 [of the JVA] sufficiently set out the
> essential terms of the SLA to be entered into between [CreAgri] and
> the JVCo. They did so by prefacing the essential terms of the supply
> of HIDROX and the grant of license by the words '*substantially
> similar to those set forth below* along with such other terms as are
> customary in agreement of such time.' [CreAgri] is thus under an
> obligation to offer to the JVCo a SLA on the essential terms as set
> forth in Clause 2.3.

*Id.* at 63-64 (emphasis added). The terms that are "set forth below" in Clause 2.3 of the JVA include the exclusive license provision in the Agreement, which grants the JV Company an exclusive license to all CreAgri IP, *without* an express limitation to the Olivenol trademarks. *Id.* Thus, the arbitrator

found that the JVA was sufficiently definite with respect to the licensing terms, and that CreAgri had bound itself to enter into an SLA that contained an exclusive license provision "substantially similar" to the one contained in the JVA. *Id*. Consequently, the Award recognizes that the terms of the license agreement as stated in the JVA control over any contradictory terms in the draft SLA, a draft that was never executed. *Id*.

These determinations did not exceed the scope of the arbitrator's authority. The arbitrator was tasked with interpreting and enforcing the JVA. In so interpreting the contract, he rejected CreAgri's contention that the terms contained in the unsigned draft agreement controlled over the language of the executed contract. This was well within the scope of the arbitrator's powers.

CreAgri does note a later inconsistency in the arbitrator's award. Despite the arbitrator finding that the JVA controls over the terms of the draft SLA, the Award later provides that CreAgri "shall within 14 days . . . enter into the Supply and License Agreement with the JVCo in the terms of the revised draft submitted [by CreAgri]." Award at 102. This appears to be a mistake in the Award. If, as the arbitrator found, CreAgri is bound to offer a SLA on terms "substantially similar" to those in the JVA, it makes little sense to force CreAgri and the JV Company to agree to the very different terms contained in the draft SLA authored by CreAgri. This seeming mistake in the Award, however, does not suggest that the Court should refuse BU8's request for confirmation.[4] Rather, to the extent either party believes the Award is internally inconsistent, they can go back to the arbitrator and seek clarification or amendment of the Award. While the arbitrator may have been inconsistent (or mistaken) when he incorporated the draft SLA into the JVA, the arbitrator was still acting within the scope of his authority by interpreting and enforcing the terms of the relevant contracts. A mistake is not equivalent to acting beyond the scope of the submission to the arbitrator. *See Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 288 (5th Cir. 2004) (acknowledging that "a court may not refuse to enforce an arbitral award solely on the ground that the arbitrator may have made a mistake of law or fact"); *Stawski Distrib. Co. v. Zywiec Breweries PLC*, No. 02-C-8708, 2004 WL 2222277, at *3 (N.D. Ill. Sept. 30, 2004) (same);

---

[4] The Court notes that despite the apparent error in the Award that appears to inure in CreAgri's favor, BU8 nevertheless seeks confirmation of the Award as currently drafted.

*Shany Co. v. Crain Walnut Shelling, Inc*., the No. 2:11-CV-01112-KJM, 2015 WL 351660, at *2 (E.D. Cal. Jan. 23, 2015) (same). A contrary ruling would place this Court in the position of serving as an appellate tribunal over the arbitrator to review substantive errors, a role not countenanced by the Convention.

CreAgri next alleges that the arbitrator exceeded the scope of his powers when he "wrongly" determined that CreAgri and its sale partners are prohibited from using the HIDROX trademark in connection with their sale of human dietary supplements, regardless of when CreAgri formed those relationships with its other partners. Docket No. 27 at 8. This argument is fundamentally flawed because resolving it would require this Court to analyze the proper scope of the exclusive license provision in the JVA, something the arbitrator had the exclusive power to determine under the terms of the JVA's arbitration clause. In any event, CreAgri's argument is also facially wanting on the merits. The JVA does not appear to provide any carve-outs to the exclusive license agreement depending on when CreAgri may have formed a commercial relationship with non-parties. CreAgri granted an *exclusive* license to BU8.

CreAgri next argues that the arbitrator exceeded the limits of his authority when he issued an award ordering CreAgri to pay BU8 60% of the net profits it obtained as a result of CreAgri's partnership with Cosway. Docket No. 27 at 9. Similarly, it argues that "the transfer of all of CreAgri's rights to revenue under any contract from any time period – including pre-JVA contracts – with any party for the sale of human dietary supplements containing HIDROX, regardless whether the JVCo is a party to those agreements," exceeded the arbitrator's authority. *Id.* Again, CreAgri is mistaken. The arbitrator's award of a portion of CreAgri's profits from the sale of HIDROX products is directly permitted under the JVA, which provided BU8 with 60% ownership of the JV Company that has an exclusive license to all CreAgri IP. The Award, which purports to vindicate these provisions of the JVA, does not exceed the scope of the arbitral submission. Award at 72, 94, 102. The arbitrator's finding that BU8 is entitled to revenues from pre-JVA contracts is a matter of contract interpretation that falls squarely within the purview of the submission to the arbitrator. The arbitrator was tasked with resolving disputes involving CreAgri's alleged breach of the JVA by, for instance, withholding from the JV Company a portion of its profits derived from its exploitation of

CreAgri IP. Resolution of this dispute and enforcement of the arbitrator's ruling clearly falls within the scope of the arbitration clause agreed to by the parties. JVA at ¶ 9.3.

CreAgri's related argument, that the Award improperly enjoins non-parties because it requires that CreAgri cease doing business with Cosway or remit 60% of its profits from its dealings with Cosway, also fails. The Award does not enjoin Cosway or any other non-party. It enjoins CreAgri and CreAgri alone by enforcing the exclusive license agreement that CreAgri entered into with BU8. Award at 93. As the Award clearly states, the "injunction restrain[s] *the Respondent* from further dealing with these companies or any other company in any manner inconsistent with its obligations under the [Agreement]." *Id.* (emphasis added). In fact, the arbitrator even comments that "the Tribunal is doing nothing more than determining the contractual obligations between the Parties, and if thought fit, ordering its compliance." *Id.* at 57. The Award's restraints on CreAgri may have an indirect impact on third parties because they prohibit CreAgri from dealing with third parties to the extent that such dealings would violate the JVA. However, these indirect impacts do not constitute an impermissible injunction on third parties, nor does the relief awarded in arbitration exceed the permissible scope of the arbitrator's powers.

Finally, CreAgri asks this Court to carefully scrutinize the factual determinations made by the arbitrator. For example, CreAgri claims that "Tribunal's Decision No. 3" falls outside the scope of the arbitrator's authority, because the arbitrator's ruling is allegedly internally inconsistent. Docket No. 27 at 12. But again, it is not this Court's role to review the substantive merits of the arbitrator's work. *See Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech.*, 763 F. Supp. 2d 12, 20 (D.D.C. 2011) ("a court must confirm an arbitration award where some colorable support for the award can be gleaned from the record"); *see also Zeiler v. Deitsch*, 500 F.3d 157, 169 (2d Cir. 2007) (reiterating that "[c]onfirmation under the Convention is a summary proceeding in nature, which is not intended to involve complex factual determinations, other than a determination of the limited statutory conditions for confirmation or grounds for refusal to confirm"). Further, it has been repeated that "careful scrutiny of an arbitrator's decision would frustrate the FAA's emphatic federal policy in favor of arbitral dispute resolution." *Int'l Trading & Indus. Inv. Co.*, 763 F. Supp.

2d at 19 (citing *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 631 (1985)) (internal citations omitted).

### 2. The Award Does Not Violate Public Policy

A court may refuse to confirm a foreign arbitration award where doing so would frustrate an important public policy. Convention art. V(2)(b); *see also Kaliroy Produce Co. v. Pac. Tomato Growers, Inc.*, 730 F. Supp. 2d 1036, 1042 (D. Ariz. 2010) (internal citations omitted) (noting that a court may refuse to confirm an award that would "violate the most basic notions of morality and justice of the forum where enforcement is sought").

CreAgri makes two arguments that the Award violates public policy: (1) the Award precludes Dr. Crea[5] and CreAgri from engaging in business with others; and (2) the Award is an exclusive and compulsory license of all CreAgri IP. Docket No. 27 at 17-18.

As an initial matter, CreAgri does not identify a specific public policy that the Award offends. Rather, CreAgri simply cites generic cases and a statutory section of the California Business and Professions Code[6] that stand for the proposition that non-compete agreements and other restraints of trade are generally disfavored. *Id.* This is insufficient to establish a public policy defense under the Convention. For instance, in *Kaliroy Produce*, the district court noted that a party needs to articulate "some explicit public policy that is well defined and dominant, and [which is] ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Kaliroy Produce*, 730 F. Supp. 2d at 1042 (internal citations omitted). CreAgri's cited precedent does not support the notion that there is some "dominant" and "explicit public policy" that would prohibit this Court from enforcing *this specific* exclusive licensing provision. In fact, one of the cases cited by CreAgri specifically states that "[e]xclusive-dealing contracts are *not* necessarily invalid." *Dayton Time Lock Service, Inc. v. Silent Watchman Corp.*, 52 Cal. App. 3d 1, 7 (1975) (emphasis added). This is because, such contracts "may provide an

---

[5] Dr. Crea is the founder of CreAgri and the owner of the U.S. patents for Hidrox.

[6] Specifically, CreAgri cites Cal. Bus. and Prof. Code § 16600, which states in full that: "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

incentive for the marketing of new products and a guarantee of quality-control distribution." *Id.* It is only where an "exclusive-dealing contract" illegally forecloses "competition in a substantial share of the affected line of commerce" (*i.e.*, only where a provision "violates antitrust laws") that such a provision will be struck down under California law. *Id.* at 6-7. Here, CreAgri has made no showing whatsoever that the terms of the JVA violate antitrust laws or any other clear public policy of this forum.

Moreover, CreAgri's arguments are again facially defective. The JVA grants an "exclusive license" of CreAgri's IP to the JV Company. Enforcing this exclusivity clause, which CreAgri voluntarily agreed to, is not the same as coercively awarding a "compulsory license"[7] or otherwise enforcing an illegal non-compete agreement. *See, e.g.*, *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1377 (Fed. Cir. 2000) (recognizing that the Patent Act specifically provides for the conveyance of exclusive licenses) (citing 35 U.S.C. § 261); *Alfred E. Mann Foundation for Scientific Research v. Cochlear Corp.*, 604 F.3d 1354, 1360 (Fed. Cir. 2010) (explaining under which circumstances an exclusive patent licensee has standing to sue for patent infringement). Here, the Award is merely enforcing terms of the JVA that CreAgri voluntarily entered into with BU8. JVA at ¶ 9.12. CreAgri agreed to grant an exclusive license of CreAgri IP when it signed the Agreement. *Id.* at ¶ 2.3(ii). CreAgri has cited no cases holding that enforcement of such a license is illegal or otherwise contrary to U.S. public policy. Thus, this is not a defense to enforcement of the Award.

3. <u>CreAgri's Remaining Defenses Are Not Cognizable Under the Convention</u>

CreAgri also asserts a number of additional "defenses" to confirmation that are not provided for under the Convention. But as a number of courts have recognized, "Article V of the Convention specifies the only grounds on which recognition and enforcement of a foreign arbitration award may be refused." *Ipitrade Int'l, S. A. v. Fed. Republic of Nigeria*, 465 F. Supp. 824, 826 (D.D.C. 1978);

---

[7] The Court notes that there does not appear to be a "compulsory license" here, because the term "compulsory license implies that *anyone* who meets certain criteria has . . . authority to use that which is licensed." *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1313 n.13 (Fed. Cir. 2007) (emphasis added). Here, only the JV Company or BU8 have the authority to use CreAgri's HIDROX-related intellectual property. The Award does not "compel" CreAgri to license its technology to any other entities.

*see also Admart AG*, 457 F.3d at 307 (same); *Ward v. Phantom Screens Mfg. (Int'l) Ltd.*, No. CIV A 04-3916 KSH, 2007 WL 2316948, at *4 (D.N.J. Aug. 9, 2007) (same). Consequently, while the Court briefly addresses each of CreAgri's additional defenses, the Court notes that each are a legal nullity in the context of these confirmation proceedings.

      CreAgri points to claimed ambiguities in the Award as a defense to BU8's petition to confirm the arbitration agreement. At the motions hearing, CreAgri argued that, under the Federal Arbitration Act (FAA), this Court may refuse confirmation of an arbitral award on the basis of ambiguities in that Award. *See* 9 U.S.C. § 10 (providing that a court may vacate an arbitration award that is not sufficiently "definite"). But while the FAA (and precedents interpreting it) may occasionally guide courts when considering whether to confirm a foreign arbitral award, *see* 9 U.S.C. § 208, FAA defenses that are inconsistent with those contained in the Convention may not be considered. 9 U.S.C. § 207 (providing that the only bases for resisting confirmation of a foreign arbitral award are those "specified in the said Convention"); 9 U.S.C. § 208 (providing that portions of the FAA might apply to foreign confirmation proceedings, but only "to the extent [the FAA] is not in conflict" with the Convention); *see also Admart AG*, 457 F.3d at 307. The Convention contains no ambiguity defense.

      CreAgri next attempts to fight confirmation on the basis that the Award demonstrates "manifest disregard for the law," but this argument also fails. Docket No. 27 at 13. Once again, CreAgri's contention must be rejected for the simple reason that "manifest disregard for the law" is not a Convention defense. Additionally, CreAgri's claim that the Award "fails Singapore's business efficacy and officious bystander test" is not cognizable. *Id.* at 16. There is no Convention defense that allows a court to refuse confirmation because the Award allegedly does not comport with the laws of the country where the award was made. The Convention does state that a court can refuse confirmation if the "*agreement* is not valid under the law to which the parties have subjected it." Convention art. V(1)(a) (emphasis added). However, CreAgri is not arguing that either the JVA or the arbitration agreement is invalid, but rather that the Award itself is invalid under Singapore law. CreAgri's defense is not a listed defense under the Convention, so it cannot be considered by this

14

Court. In any event, it is not within this Court's authority (or competence) to make factual and legal determinations under Singapore law.

In sum, the Court finds that CreAgri has no basis to resist confirmation of the Award, and thus this Court will confirm it.

C. <u>BU8's Motion to Strike CreAgri's Pleadings and Dismiss Counterclaims</u>

In its answer to BU8's petition to confirm the arbitration award, CreAgri asserts the following counterclaims: (1) Vacatur of the Arbitration Award; (2) Restoration of CreAgri's Equity in the JV Company; (3) Rescission of the JVA; (4) Fraudulent Concealment; (5) Constructive Fraud; (6) Breach of Fiduciary Duties; and (7) Declaratory Relief. Docket No. 14 (CreAgri's First Amended Answer, Affirmative Defenses, and Counterclaims) at 6.

This Court dismisses CreAgri's first counterclaim requesting vacatur of the arbitration award because, as discussed above, the Court must confirm such awards where the Convention defenses are not met. 9 U.S.C. § 207. Here, CreAgri has not established any such defenses, and so the Court has determined to confirm the Award.

BU8 argues that CreAgri's remaining counterclaims must also be dismissed because the JVA requires CreAgri to arbitrate these disputes. The JVA includes an arbitration clause that provides that "*any* dispute or claim *related to or arising out* of this Agreement, or the interpretation, making, performance, breach or termination thereof . . . that is not resolved by the parties themselves . . . shall be finally settled by arbitration. . . ." JVA at ¶ 9.3 (emphases added). Thus, according to BU8, CreAgri has waived its right to bring its counterclaims in this proceeding. Mot. at 7.

BU8 correctly argues that if CreAgri's counterclaims are covered under the arbitration clause of the JVA, then these claims should be sent to arbitration. The Ninth Circuit explicitly held as much in *Polimaster*. There, the court held that the "term 'dispute' in an arbitration agreement encompasses both claims and counterclaims." *Polimaster Ltd.*, 623 F.3d at 837. Thus, the court concluded that all disputes, including counterclaims, needed to be resolved by arbitration because the parties agreed to arbitrate all "disputes" pursuant to language in their contract. *Id.* (concluding that "the arbitration agreement required that all requests for affirmative relief, whether styled as claims or counterclaims, be arbitrated").

Similarly here, the parties agreed to arbitrate "any dispute or claim related to or arising out of this Agreement." JVA at ¶ 9.3. Thus, this Court cannot consider CreAgri's counterclaims to the extent that any of the counterclaims relate to or arise out of the JVA. *See Polimaster*, 623 F.3d at 837. Here, all of CreAgri's remaining counterclaims directly relate to, or arise under, the JVA.

CreAgri's second and seventh counterclaims, which seek restoration of CreAgri's equity in the JV Company, are intimately related to the JVA, because that contract specifically allocates the amounts of equity CreAgri and BU8 are entitled to in the JV Company. JVA at ¶ 1.2. Thus, any disputes relating to the parties' ownership shares must be (and actually were) resolved by the arbitrator. *See* Award at 103.

Similarly, CreAgri's third counterclaim is intimately tied to the JVA, as it actually calls for rescission of that Agreement. As for CreAgri's allegations of actual and constructive fraud (the fourth and fifth counterclaims), these claims too are connected to the JVA. CreAgri's fraud claims allege that BU8 made false representations regarding the JV Company's business plans and revenues in order to dupe CreAgri into signing the JVA. Again, a claim that BU8 fraudulently induced CreAgri into entering the JVA is a "dispute relating to or arising out of [the] Agreement." JVA at ¶ 9.3.

Finally, CreAgri alleges that Bryan Lee Hui Leong[8] and Shiew Man Hon[9] breached their fiduciary duties to CreAgri by misappropriating funds and misrepresenting their business plans. Mr. Leong's and Mr. Hon's fiduciary duties to CreAgri (to the extent they have any) arise solely from the JVA. Thus, under the terms of the arbitration clause of the JVA, these counterclaims must also be dismissed because they can only be pursued in arbitration.

D.      BU8's Request for Fees and Costs

BU8 asserts that it is entitled to attorneys' fees and costs incurred as a result of prosecuting this confirmation proceeding. BU8 makes two arguments: (1) it is entitled to fees and costs under

---

[8] Bryan Lee Hui Leong is the principle owner, director, and shareholder of BU8's parent company. Docket No. 14 at 15.

[9] Shiew Man Hon is the CEO of the JV Company. Award at 38.

section 7.3 of the JVA; and (2) this Court has the inherit power to award attorneys' fees when a party acts in bad faith. Mot. at 20-23.

Section 7.3 of the JVA arguably requires a party found to have breached the JVA to pay the non-breaching party's attorneys' fees connected to any arbitration. JVA at ¶ 7.3. Section 7.3 states in relevant part:

> Each Party . . . will indemnify . . . any and all . . . reasonable attorneys'
> [] fees . . . suffered by any such indemnitee as a result of . . . [any]
> breach or nonfulfillment of any representations, covenants or
> agreements made by the indemnitor pursuant to this Agreement . . . .

JVA at ¶ 7.3. While this fairly broad provision may permit BU8 to recover fees incurred in connection with the prosecution of these proceedings, any such claim will need to be submitted to arbitration. The Agreement, as noted above, requires that all disputes "related to or arising out of" the Agreement be submitted to arbitration in Singapore. A dispute over entitlement to fees under one of the provisions of the Agreement itself seems to be clearly covered by the arbitration provision.

In regards to BU8's second argument, this Court finds that CreAgri has not acted vexatiously or in bad faith so as to justify an award of fees. This Court does have the inherent authority to award attorneys' fees in an action brought under the Convention "when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons." *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc*. (*Ministry I*), 665 F.3d 1091, 1104 (9th Cir. 2011). For example, "[a]n unjustified refusal to abide by an arbitrator's award" may constitute an act of bad faith sufficient to warrant a fees award. *Id.*

On remand in *Ministry of Defense I*, the district court granted a motion for attorneys' fees where the losing party's "opposition to confirmation of the award was weak" and "it raised entirely new arguments on appeal." *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc*. (*Ministry II*), No. 98-CV-1165-B DHB, 2013 WL 55828, at *6 (S.D. Cal. Jan. 3, 2013). The court further emphasized that the losing party "remained silent" when the opposing party tried to settle the dispute informally and after the final award was issued.

*Id.* Additionally, the court pointed out that the losing party's "position was unrelated to the arbitration proceedings and events that occurred after the [arbitrator] issued its decision." *Id.*

In another example, a court found an attorneys' fees award to be appropriate when the losing party failed to participate in the proceedings to confirm the arbitral award, which led to a default judgment being entered against it. *Concesionaria Dominicana de Autopistas y Carreteras, S.A. v. Dominican State*, 926 F. Supp. 2d 1, 3 (D.D.C. 2013).

The above cases demonstrate that a party should only be awarded attorneys' fees when the losing party engages in particularly egregious conduct. While CreAgri's arguments in opposition to confirmation of the award were ultimately unsuccessful, the Court concludes that its actions do not demonstrate bad faith sufficient to merit an award of attorneys' fees.

## IV. CONCLUSION

BU8's motion to confirm the arbitration award and to dismiss CreAgri's counterclaims is granted. BU8's motion for this Court to award fees and costs is denied.

This order disposes of Docket No. 15.

IT IS SO ORDERED.

Dated: March 6, 2015

_____
EDWARD M. CHEN
United States District Judge